No. 70,681

In the Matter of the Appeal of Harbour Brothers Construction Co., Inc., from an Order of the Director of Taxation on Assessment of Sales Tax.

(883 P.2d 1194)

Opinion filed November 4, 1994.

*James Bartle,* of Kansas Department of Revenue, argued the cause and was on the briefs for appellant.

*Benjamin J. Neill,* of Neill & Terrill, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Six, J.: This is a retailers' sales tax exemption case. The claimed exemption relates to the materials purchased and labor services provided by a contractor. The Kansas Department of Revenue (KDR) appeals from a decision of the Board of Tax Appeals (BOTA) granting exemptions to Harbour Brothers Construction Company, Inc. (Harbour). The dispute concerns whether Harbour was entitled to sales tax exemptions for its work laying asphalt parking lots at the Sandstone Amphitheater (Sandstone) in Bonner Springs in 1989. The KDR concluded that Harbour had failed to pay sales tax on the materials it purchased and used, and on the labor services it provided for Sandstone. The Director of Taxation (Director) upheld the assessment of $50,803, plus interest and penalties. In a 3-2 decision, however, BOTA reversed the assessment, holding that the parking lot materials were exempt from sales tax under K.S.A. 79-3606(d) and the labor services were exempt under K.S.A. 79-3603(p). The KDR challenges BOTA's

interpretation of these exemptions and the application of the exemptions to the facts of this case.

Our jurisdiction is under K.S.A. 20-3018(c) (a transfer from the Court of Appeals on our own motion).

We reverse BOTA and reinstate the order of the Director upholding the assessment against Harbour, plus interest and penalties. Neither the materials purchased by Harbour nor the labor services it provided were exempt from retailers' sales tax.

## Facts

The arguments on the sales tax exemptions at issue require an understanding of events preceding Harbour's involvement at Sandstone.

In August 1983, the Board of Park Commissioners of Wyandotte County (Wyandotte County or the County) entered into a lease agreement with Star Brite, Inc. (Star Brite). Star Brite agreed to build Sandstone and produce entertainment events on property owned by Wyandotte County. In return, Wyandotte County would own the amphitheater and receive a share of the ticket, concession, novelty, and parking proceeds from each event, or a guaranteed minimum annual lease payment. As part of the agreement, Wyandotte County promised to improve street access, bring sewer, water, and electricity to the site, and, most pertinent to the case at bar, construct "parking facilities . . . includ[ing] a total of 6,500 spaces" as shown on a preliminary plan.

The amphitheater at Sandstone opened for business in June 1984, but the parking lots were not constructed according to the original agreement. For several years, the only improved parking lots at Sandstone were gravel. Finally, in November 1988, Wyandotte County and Star Brite agreed to amend the original lease agreement. The amended agreement explained that the County had not met its original obligation with respect to the parking lots. The County was relieved from its original parking lot obligation if it would provide financing to Star Brite's assignee, World Entertainment Services Kansas, L.P. (World Entertainment), to construct parking lots and other improvements such as restrooms, concession stands, and landscaping. World Entertainment is a

company owned and controlled by the Star Brite principals. Thus, World Entertainment became responsible for the Sandstone parking lots.

World Entertainment awarded the parking lot bid to Harbour in December 1988. Harbour began work immediately. It submitted two invoices to World Entertainment for progress payments totaling $241,267.10. World Entertainment then submitted to the County Auditor a request for payment of Harbour's invoice in full. Harbour received a check for the full amount from Home State Bank in Kansas City, Kansas, which was drawn on a Wyandotte County account funded by general obligation redevelopment bonds. A similar procedure occurred for subsequent invoices submitted by Harbour, one for $303,138.06 and another for $302,306.70.

The KDR audited Harbour for the period from June 1, 1986, to May 31, 1989, and issued a Notice of Assessment of Additional Retailers' Sales Tax in the total amount (additional tax, interest, and penalties) of $207,100. Harbour and the KDR settled much of the assessment, which involved many unrelated projects, but the parties could not agree on the sales tax consequences of Harbour's Sandstone work from January-May 1989. The only amount in dispute ($50,803 in tax, plus interest and penalties) pertains to the Sandstone project.

The KDR auditor found that Harbour did not: (1) pay sales tax on its purchases of materials used in constructing the Sandstone lots; (2) charge and remit sales tax on the labor services it provided at Sandstone; (3) obtain a project exemption certificate for purchasing materials for the Sandstone project; or (4) purchase the services of any subcontractors for the project. The only taxable services related to the project were those provided directly by Harbour, billed to World Entertainment, and paid for by Wyandotte County. Harbour does not contest any of these findings by the auditor.

### Action of the Director of Taxation

Harbour protested the KDR's assessment by filing a timely petition for an administrative hearing with the Director of Taxation.

The Director decided that the KDR correctly assessed sales tax under K.S.A. 79-3603(l) for the purchase of materials and under K.S.A. 79-3603(p) for labor services. The Director rejected Harbour's claim that the entire Sandstone project was exempt under K.S.A. 79-3606(b) as a direct purchase by a political subdivision because Harbour did the work for and billed World Entertainment, thus defeating the requirements of a "direct purchase." The Director also rejected Harbour's claim that the materials purchase was exempt under K.S.A. 79-3606(d), reasoning that Harbour did not furnish a project exemption certificate as required under subsection (d). Finally, the Director rejected Harbour's claim that its labor services were exempt under the "original construction" exception to K.S.A. 79-3603(p) because the project was not "original construction" as defined in the statute and further explained in K.A.R. 92-19-66b(f).

## The BOTA Hearing and Decision

Harbour appealed the Director's decision to BOTA. At the BOTA hearing, Harbour submitted documentary evidence consisting of the original and amended agreements between Wyandotte County and Star Brite, Harbour's invoices to World Entertainment, and payments from Wyandotte County. Harbour put on no live testimony or other evidence. The KDR submitted documentary evidence consisting of the audit report of Harbour's records and a published revenue ruling by the KDR regarding tax-exempt construction projects. The KDR also offered the testimony of the auditor who examined Harbour's books and a KDR tax specialist.

The BOTA majority stated that it "agrees with the Taxpayer that pursuant to K.S.A. 79-3606(d) a project exemption certificate is only required if there is a contract directly with the political subdivision." Since Harbour's work was "pursuant to a contract between the Taxpayer and World Entertainment and not a contract between the Taxpayer and Wyandotte County," no project exemption certificate was required. Thus, BOTA found that "the purchase of the materials and services used by the Taxpayer in constructing the Sandstone parking lots is exempt from sales tax pursuant to K.S.A. 79-3606(d)."

The BOTA majority further concluded that the labor associated with the project is exempt pursuant to K.S.A. 79-3603(p). Specifically, BOTA found that "the construction of the parking lots: 1) was a part of the original plans for Sandstone, 2) is included in the definition of 'building' by being improvements immediately surrounding the Sandstone Amphitheater, and 3) was not replacement, but was new construction of asphalt parking lots." Based on these conclusions, BOTA granted Harbour's request to abate the sales tax assessment, interest, and penalties.

The two dissenting members reasoned that they "would find and conclude pursuant to the applicable statutes and regulations that the Department of Revenue's assessment should be upheld in its entirety." Specifically, the dissenters argued that Harbour's purchase of materials for Sandstone was taxable under K.S.A. 79-3603(l) and K.A.R. 92-19-66(a) and (b) and that the sales tax exemption under K.S.A. 79-3606(d) requires that a project exemption certificate be obtained. Further, the dissenters contended that "[s]ince the Sandstone Amphitheater opened in 1984 and the parking lot(s) at issue were constructed in 1989, the parking lots could not have been built in connection with the first or initial construction of the amphitheater." They concluded that the labor associated with the construction of the parking lots was not exempt.

## Introduction and Standards of Review

We are reviewing BOTA's interpretation and application of two provisions (K.S.A. 79-3606[d] and 79-3603[p]) of the Kansas Retailers' Sales Tax Act, K.S.A. 79-3601 *et seq.* (the Act). The KDR, as authorized by K.S.A. 79-3618, has published extensive regulations on the Act. Several regulations, K.A.R. 92-19-66, K.A.R. 92-19-66a, and K.A.R. 92-19-66b are applicable to the two exemptions at issue in the case at bar.

BOTA focused exclusively on the statutory text of K.S.A. 79-3606(d) and 79-3603(p). BOTA did not address or cite any KDR regulations in explaining its findings and conclusions. BOTA has referenced and relied upon KDR regulations in denying a similar "original construction" exemption in *In re Tax Appeal of McKee,*

19 Kan. App. 2d 43, 46, 861 P.2d 1386 (1993). (We discuss *McKee* later in this opinion.) The Director's decision and the BOTA dissent explicitly relied at least in part on the regulations. Similarly, on appeal, Harbour, siding with the BOTA majority, does not cite a single regulation in its reply brief, while the KDR, siding with the Director and the BOTA dissent, argues extensively from the regulations.

Underlying the ultimate issues of statutory interpretation are questions regarding the appropriate standards of review. First, how much deference should we give to BOTA's interpretations of the Act? Second, what effect should BOTA and this court give the KDR published regulations on the Act? The scope and standards of review shall be discussed first, before turning to the specific issues raised.

BOTA orders are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* See K.S.A. 74-2426(c); *In re Tax Appeal of A.M. Castle & Co.*, 245 Kan. 739, 741, 783 P.2d 1296 (1989). We may grant relief from a BOTA order if we conclude that "the agency has erroneously interpreted or applied the law." K.S.A. 77-621(c)(4). The KDR seeks relief in the instant case from the BOTA order exclusively on the basis of 77-621(c)(4).

Interpretation of a statute is a question of law. *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). Special rules apply, however, when considering whether an administrative agency "erroneously interpreted or applied the law":

"The interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to judicial deference. This deference is sometimes called the doctrine of operative construction. . . . [I]f there is a rational basis for the agency's interpretation, it should be upheld on judicial review. . . . [However,] [t]he determination of an administrative body as to questions of law is not conclusive and, while persuasive, is not binding on the courts." *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166, 815 P.2d 66 (1991).

Deference to an agency's interpretation is especially appropriate when "the agency is one of special competence and experience." *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 246, 834 P.2d 368 (1992). However, the final construction of a statute always

rests with the courts. *In re Tax Exemption Application of City of Wichita*, 255 Kan. 838, 842, 877 P.2d 437 (1994).

Two administrative bodies—BOTA and the KDR—each have a role in administering the Act, and they disagree on the interpretation and application of K.S.A. 79-3606(d) and 79-3603(p) to the facts of the case at bar. The BOTA-KDR disagreement raises an interesting question (not raised by the parties): Which agency's interpretation should be entitled to greater deference? The KDR ("secretary of revenue") is commanded by the legislature to "administer and enforce [the Act]," and to "adopt rules and regulations for the administration of this act." K.S.A. 79-3618. The KDR regulations "interpret" the statutes, and such regulations, properly adopted and published as Kansas Administrative Regulations, have the "force and effect of law." K.S.A. 77-425; *Bruns v. Kansas State Bd. of Technical Professions*, 255 Kan. 728, Syl. ¶ 1, 877 P.2d 391 (1994); see *Jones v. The Grain Club*, 227 Kan. 148, 150, 605 P.2d 142 (1980).

We have expressed the principles governing review of BOTA decisions on the availability of tax exemptions:

" 'Taxation is the rule, and exemption from taxation the exception under the Kansas Constitution and statutes. [Citations omitted.] Constitutional and statutory provisions exempting property from taxation are to be strictly construed against the one claiming exemption, and all doubts are to be resolved against exemption. [Citations omitted.] Where the language of a statute, in particular, is relied upon as creating an exemption from taxation, it must be strictly construed against the party claiming the exemption, and he must bring himself clearly within the exemption. [Citations omitted.] Strict construction, however, does not warrant unreasonable construction. [Citation omitted.]' " *In re Tax Exemption Application of City of Wichita*, 255 Kan. at 842 (ad valorem tax case) (quoting *Tri-County Public Airport Auth. v. Board of Morris County Comm'rs*, 245 Kan. 301, 304-05, 777 P.2d 843 [1989]).

See also *Board of Park Comm'rs, City of Wichita v. State, ex rel.*, 212 Kan. 716, 717, 512 P.2d 1040 (1973) (retailers' sales tax case); *Warren v. Fink*, 146 Kan. 716, Syl. ¶ 1, 72 P.2d 968 (1937) (retailers' sales tax case); *In re Tax Appeal of McKee*, 19 Kan. App. 2d at 48 (retailers' sales tax case).

Harbour contends that "sales tax statutes are penal" and thus "must be strictly construed in favor of the taxpayer," citing *J. G.*

*Masonry, Inc. v. Department of Revenue*, 235 Kan. 497, 500, 680 P.2d 291 (1984). The rules of construction for sales tax statutes are as follows: Statutes that *impose* the tax are to be strictly construed in favor of the taxpayer. *Board of Park Comm'rs*, 212 Kan. at 717; *Equitable Life Assurance Society v. Hobbs*, 154 Kan. 1, 13, 114 P.2d 871 (1941). Tax *exemption* statutes, on the other hand, such as K.S.A. 79-3606, (exempt sales) are to be "construed strictly in favor of imposing the tax and against allowing the exemption for one who does not clearly qualify." *Board of Park Comm'rs*, 212 Kan. at 717. K.S.A. 79-3603(p) both imposes a sales tax on services and exempts services related to "original construction."

The resolution of the case at bar does not require us to reach the question of which agency's interpretation is entitled to greater deference. BOTA construed the materials exemption in K.S.A. 79-3606(d) in a way that appears contrary to legislative purpose. BOTA also failed in its findings and conclusions to reference the published regulations applicable to the "original construction" exemption of K.S.A. 79-3603(p).

### The Purchase of Materials for Use at Sandstone

In early 1989, the Act imposed a sales tax of 4% on, among other things, "the gross receipts received from the sales of tangible personal property to all contractors . . . of materials and supplies for use by them in erecting structures for others, or building on, or otherwise improving . . . real or personal property of others." K.S.A. 79-3603(l). In the instant case, K.S.A. 79-3603(l) imposed a tax on the sales of materials (asphalt) by a retailer (supplier) to the contractor (Harbour). By statute, it was the duty of the "retailer . . . to collect from the consumer or user, the full amount of the tax imposed by this act." K.S.A. 79-3604.

Through its field audit, the KDR determined that Harbour failed to pay sales tax to its suppliers on the materials it purchased for Sandstone. Harbour does not contest that determination. Instead, Harbour argues that (1) the KDR lacks authority to collect unpaid sales tax on the purchase of materials by Harbour because

it was the retailer's (supplier's) duty to collect and remit such tax and (2) the materials were exempt from sales tax by virtue of K.S.A. 79-3606(d), which pertains to projects for political subdivisions.

Harbour's first argument fails because of a 1988 amendment to K.S.A. 79-3604 (Ensley 1984): "In the event the full amount of the tax provided by this act is not paid to the retailer by the consumer or user, the director of taxation may proceed directly against the consumer or user to collect the full amount of the tax due on the retail sale." L. 1988, ch. 388.

Next, Harbour argues that its purchases of materials for the Sandstone project were exempt under K.S.A. 79-3606(d). To understand the exemption in subsection (d), it is helpful to look first at subsection (b). Subsection (b) exempts from retailers' sales tax "all sales of tangible personal property or service . . . *purchased directly* by the state of Kansas [or] a political subdivision thereof" (unless the property or service is to be used in the business of furnishing gas, water, electricity or heat to others). (Emphasis added.) No special certificate is required in order for the political subdivision to qualify, but according to regulations, in order "[t]o qualify as a direct purchase, each bill, invoice, contract or other evidence of the transaction shall be made out in the name of the political subdivision . . . , *and* each payment shall be made on the check, warrant or voucher of the political subdivision." K.A.R. 92-19-76(b). If Wyandotte County had purchased asphalt directly from a supplier and purchased labor services directly from Harbour, those purchases would have been exempt under subsection (b). But, as Harbour's counsel admitted at the hearing before BOTA, "We don't have that here."

Wyandotte County contracted with World Entertainment, which contracted with Harbour, which bought the materials and provided its own labor services. At issue is whether Harbour was entitled to a sales tax exemption under K.S.A. 79-3606(d) when purchasing the materials. Subsection (d) exempts

"all sales of tangible personal property or services *purchased by a contractor* for the purpose of constructing . . . facilities for . . . any political subdivision of the state, the total cost of which is paid from funds of such political subdivision

and which would be exempt from taxation under the provisions of this act if purchased directly by such political subdivision." (Emphasis added.)

Harbour argues that we should apply only the portion of subsection (d) quoted above. By doing so, Harbour would appear to qualify for the materials exemption. Harbour is a contractor that purchased materials, the total cost of which was paid from funds of the County. The materials would have been exempt if purchased directly by the County (because the materials were not for use in furnishing gas, electricity, etc.). However, subsection (d) continues:

"When any political subdivision . . . shall contract for the purpose of constructing . . . facilities, it *shall* obtain from the state and furnish to the contractor an exemption certificate for the project involved, and the contractor may purchase materials for incorporation in such project. The contractor *shall* furnish the number of such certificate to *all* suppliers from whom such purchases are made, and such suppliers shall execute invoices covering the same bearing the number of such certificate." (Emphasis added.)

Harbour did not have a project exemption certificate for the Sandstone project. Harbour argues, however, that the certificate requirement in subsection (d) applies only when the political subdivision *directly* contracts with a contractor, not in the current situation where a third party (World Entertainment) stands between the political subdivision and the contractor. Harbour cites no authority supporting its construction of K.S.A. 79-3606(d), but relies upon the "plain meaning" of the statute. Similarly, the BOTA majority did not explain its reasoning for adopting Harbour's interpretation, but simply stated: "The Board agrees with the Taxpayer that pursuant to K.S.A. 79-3606(d) a project exemption certificate is only required if there is a contract directly with the political subdivision."

The interpretation of K.S.A. 79-3606(d) advanced by Harbour and BOTA raises several questions. First, nothing in the text of subsection (d) limits the project exemption certificate requirement the way Harbour contends. Apparently, Harbour relies on the following emphasis to suggest that the certificate requirement applies only to contractors directly contracting with the political subdivision: "When any political subdivision . . . *shall contract* . . . for the purposes of constructing . . . facilities, *it shall*

*obtain . . . and furnish to the contractor* an exemption certificate." The text is not persuasive of Harbour's interpretation, particularly considering the fact that "contractor" is interchangeable, definitionally, with "subcontractor" and "repairman" under the regulations concerning project exemption certificates. See K.A.R. 92-19-66a. We also note that in an amendment that took effect shortly after Harbour's work at Sandstone, the legislature also grouped contractors, subcontractors, and repairmen in a single definition. See K.S.A. 79-3602(r). The text relied on by Harbour does not say, "When any political subdivision shall contract *directly with a contractor . . .* it shall furnish to *that* contractor an exemption certificate."

Second, the KDR regulations on project exemption certificates make no such distinction between contractors that directly contract with the political subdivision and contractors (or subcontractors) working on the same project but under contract with another entity. Under K.A.R. 92-19-76(c), the project exemption certificate requirement applies to purchases of materials or services by an "agent, employee or other representative of a political subdivision." Further, the same regulation makes clear that despite the relationship between a political subdivision and a contractor, the contractor must have a project exemption certificate to purchase materials and services exempt from retailers' sales tax:

· *"Any contractual arrangement or understanding* between an agent or employee and a political subdivision shall not be recognized by the department, and the retailer shall charge and collect the sales tax on the total selling price of tangible personal property or service, even though:

"(1) The agent or employee may be on official business on behalf of the political subdivision;

"(2) is on a per diem from the political subdivision;

"(3) is on an expense account, allowance or shall otherwise be reimbursed by the political subdivision; or

"(4) has or will receive monies, credits or other assets from the political subdivision to pay for the transaction." (Emphasis added.)

Third, Harbour's interpretation conflicts with the purpose behind the project exemption certificate requirement, which is to provide proof that an otherwise taxable transaction between two

private entities is exempt because it is connected to a project for a political subdivision. Where the political subdivision makes the purchase directly, no certificate is required because presumably there is a check or some verification in the hands of the supplier (the entity primarily responsible for paying the tax) identifying the political subdivision as the purchaser. Where the political subdivision is not directly involved at the point of purchase, however, the certificate requirement applies. K.A.R. 92-19-66a, in pertinent part, explains the exemption certificate:

"(a) Project exemption certificates are only issued by the department of revenue. (1) Only entities specifically designated by statute may petition the department for a project exemption certificate for a construction project. . . . Upon approval from the department, the petitioning entity shall give the contractor the project exemption certificate.

"(2) *Each contractor, subcontractor, or repairman* may use a project exemption certificate to purchase material for use in a qualifying project without tax. Each supplier selling materials to contractors under this exemption shall execute invoices bearing the certificate number. . . .

"(b) (1) If an entity qualifies for a project exemption, but fails to secure a project exemption certificate from the department, *all contractors, subcontractors or repairmen* purchasing materials for use in a construction project for that entity shall pay sales tax on the total cost of the materials, even though the entity for whom the project is being performed could directly purchase the same materials without sales tax.

. . . .

"(c) Project exemption certificates shall be prospective in nature. A project exemption certificate shall not be granted after a construction project is completed to secure a deduction, exclusion, credit or refund of sales tax previously paid on purchases of materials by contractors, subcontractors or repairmen . . . ." (Emphasis added.)

We find no reasoned rationale supporting the BOTA majority's construction of the K.S.A. 79-3606(d) sales tax exemption. Neither the statute nor the regulations on project exemption certificates make any distinction among contractors, subcontractors, or repairmen based on whether they have a direct contract with the political subdivision. If the interpretation of the BOTA majority and Harbour is correct, then a subcontractor working on a project for a political subdivision would not need a project exemption certificate when purchasing materials if its contract was with the

contractor, but it would need a certificate if its contract was directly with the political subdivision. We reverse the BOTA's decision on the materials exemption. See K.S.A. 77-621(c)(4). Because Harbour did not have a project exemption certificate for the Sandstone project, it was not entitled to purchase its materials for the project exempt from sales tax.

### "Original Construction" and Harbour's Services

The KDR contends that BOTA erred in holding that Harbour's labor services on the project were exempt from retailers' sales tax under the "original construction" exemption of K.S.A. 79-3603(p). We agree. K.S.A. 79-3603 provides:

"[T]here is hereby levied and there shall be collected and paid a tax at the rate of [4%, as of May 1989] upon:

"(p) the gross receipts received for the service of installing or applying tangible personal property . . . , except that no tax shall be imposed upon the service of installing or applying tangible personal property in connection with the original construction of a building or facility . . . .

"For the purposes of this subsection:

"(1) 'Original construction' shall mean the *first or initial* construction of a new building or facility. The term 'original construction' shall include the addition of an entire room or floor to any existing building or facility, *the completion of any unfinished portion of any existing building or facility* and the restoration, reconstruction or replacement of a building or facility damaged or destroyed by fire, flood, tornado, lightning, explosion or earthquake, but such term shall not include replacement, remodeling, restoration, renovation or reconstruction under any other circumstances;

"(2) 'building' shall mean only those enclosures within which individuals customarily live or are employed, or which are customarily used to house machinery, equipment or other property, and *including the land improvements immediately surrounding such building.*" (Emphasis added.)

Harbour argued and the BOTA majority concluded that the parking lots constructed in 1989 were a part of the "original construction" of the amphitheater, which opened for business in 1984. BOTA's order stated:

"Specifically, the Board finds that the construction of the parking lots: 1) was a part of the original construction plans for Sandstone, 2) is included in the definition of 'building' by being improvements immediately surrounding the Sandstone Amphitheater, and 3) was not replacement, but was new construction of asphalt parking lots."

The KDR challenges BOTA's decision as contrary to *J. G. Masonry, Inc. v. Department of Revenue*, 235 Kan. 497, 680 P.2d 291 (1984), and *In re Tax Appeal of McKee*, 19 Kan. App. 2d 43, 861 P.2d 1386 (1993). We held in *J. G. Masonry* that (1) under the plain language of K.S.A. 79-3603(p)(1), the construction of an office room within an existing building was not an "addition" that was "original construction" and (2) the construction of masonry walls outside an existing building, which were "built as a separate project and not as a part of the original construction of the building," did not qualify for the "original construction" exemption. 235 Kan. at 501. The *J. G. Masonry* facts do not clarify how long after the original construction of the building the outside masonry walls were built, other than "long after the completion of the original building." 235 Kan. at 501. *J. G. Masonry* does not control the question in the instant case, which is whether a parking lot that was in the original plans for a building, but was not completed for several years after completion of the building, can still come within the "original construction" exemption.

*McKee* held that 18 in-ground, outdoor swimming pools built adjacent to previously existing homes were not "additions" under the "original construction" exemption. The pools were "land improvements immediately surrounding the buildings" and thus had to be built in connection with the original construction of the homes in order for labor services to be exempt under K.S.A. 79-3603(p). 19 Kan. App. 2d at 51. Since the taxpayer failed to prove either that (1) the pools were constructed as part of the "first or initial construction" of the homes or (2) building the pools involved "completion of any unfinished portion of any existing building," K.S.A. 79-3603(p)(1), no exemption was available. In making the latter determination, the Court of Appeals specifically noted the applicability of K.A.R. 92-19-66b(f)(1)-(4). 19 Kan. App. 2d at 52. *McKee* quoted the BOTA order which observed, among other things:

" 'The evidence shows that most of the pools were constructed greater than one year after the homes were constructed. As stated by the Court in J. G. Masonry, it appears to not be within the legislative intent to exempt exterior improvements that are added to the property long after the completion date of the original building.' " 19 Kan. App. 2d at 46.

The KDR fails to cite K.A.R. 92-19-66b(f), although it is directly applicable to the question whether the Sandstone parking lots are exempt under K.S.A. 79-3603(p) as the "completion of any unfinished portion of an existing building." The Director, in deciding the "original construction" issue, stated that "K.A.R. 92-19-66b(f) controls." K.A.R. 92-19-66b, which became effective May 1, 1988 (before the parking lot construction), states in pertinent part:

"(f) Services of installing or applying tangible personal property to complete unfinished portions of *newly constructed* buildings . . . shall not be subject to sales tax. Services performed to install or apply tangible personal property for the completion of an unfinished portion of an *existing* building or facility shall not be taxable when:

"(1) *The service being rendered was called for in the original blue print, building plan or building specification* at the time original construction of that building or facility was started, including any change orders issued during the original construction of the building or facility;

"(2) the *completion* of the unfinished portion of the building or facility *is within a time reasonably requisite to the original construction* of the building or facility;

"(3) *the service rendered would have been performed at the time of the original construction of the building or facility, except for circumstances beyond the owner's control.* Those circumstances shall not include instances in which the project is essentially completed and usable for the purposes intended, but the owner merely fell short of funds, or when the owner, after taking possession or occupancy of the building or facility, contracts for additional services; and

"(4) the owner or occupant is the first or initial owner or occupant of the building or facility." (Emphasis added.)

Under K.A.R. 92-19-66b, Harbour either must argue that (1) the amphitheater was "newly constructed" at the time that it installed the paved parking lots—which is dubious since the amphitheater had been open for business for five years—or (2) the parking lot project met the criteria of (f)(1)-(4) as the "completion of an unfinished portion of an existing building." The Director decided against Harbour based on (f)(3), finding that Harbour had made "no showing . . . as to why the parking lots were not constructed at the time of the original construction of the amphitheater." Harbour, it appears, did not introduce any evidence in its BOTA hearing in an attempt to make such a showing. Also, (f)(2) iden-

tifies a problem turning on the question whether parking lots constructed two to five years after completion of a building were built "reasonably requisite to the original construction." Under K.A.R. 92-19-66b(f), the fact that parking lots were in the original plans for the Sandstone project is only one of four factors that must be shown in order for Harbour's labor services to qualify for the tax exemption. Harbour's heavy reliance on the original plans factor overlooks the other relevant K.A.R. 92-19-66b(f) factors.

We need not decide whether the parking lots were constructed "reasonably requisite" to the original construction of the amphitheater under the meaning of K.A.R. 92-19-66b(f)(2). The Director did not decide the question on those grounds, and we think that decisions of "reasonableness" should be made through the exercise of discretion by the taxing agencies, not by this court for the first time on appeal. We hold that under K.A.R. 92-19-66(f)(3), Harbour has failed to show why the parking lots were not constructed at the time of the original construction. We reverse BOTA on the labor services issue. K.S.A. 77-621(c)(4).

Harbour during oral argument before this court asserted that K.S.A. 79-3640, which allows a political subdivision in certain circumstances to recoup sales tax that it paid, renders the KDR's attempt to collect unpaid sales tax from Harbour futile. Harbour's reasoning assumes that it will bill the County for the tax and the County will then recoup under K.S.A. 79-3640. Since BOTA decided the case in Harbour's favor on other grounds, BOTA did not address the K.S.A. 79-3640 claim. K.S.A. 79-3640 says nothing about relieving a private party of the duty to pay sales tax when performing work for a political subdivision. Harbour has neither filed a cross-appeal nor briefed the issue. The applicability of K.S.A. 79-3640 is not before us. See *Plummer Development, Inc. v. Prairie State Bank*, 248 Kan. 664, 666, 809 P.2d 1216 (1991).

BOTA's order abating the Director's order imposing the sales tax, plus interest and penalties, is reversed. We remand to BOTA to determine the total amount of retail sales tax assessment, plus interest and penalties, owing by Harbour.

ABBOTT, J., concurring in the result.