No. 74,088

THE MOST WORSHIPFUL GRAND LODGE OF ANCIENT FREE AND ACCEPTED MASONS OF KANSAS AND ITS APPENDANT BODIES IN SHAWNEE COUNTY, KANSAS; SILOAM LODGE NO. 225; GOLDEN RULE LODGE NO. 90; TOPEKA LODGE NO. 17; ORIENT LODGE NO. 51; SEABROOK LODGE NO. 385; AND AUBURN LODGE NO. 32, *Plaintiffs*, and TOPEKA COUNTRY CLUB and SHAWNEE COUNTRY CLUB, *Intervenors/Appellants*, v. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SHAWNEE; WINIFRED KINGMAN, SHAWNEE COUNTY COMMISSIONER; DON COOPER, SHAWNEE COUNTY COMMISSIONER; VICTOR MILLER, SHAWNEE COUNTY COMMISSIONER; AND MARK HIXON, SHAWNEE COUNTY APPRAISER, *Defendants/Appellees*.

(912 P.2d 708)

Opinion filed March 8, 1996.

*Brian S. Burris*, of Martin, Pringle, Oliver, Wallace & Swartz, L.C., of Wichita, argued the cause and was on the briefs for intervenors/appellants.

*Susana L. Valdovinos*, assistant county counselor, argued the cause and was on the brief for appellees.

*Jack A. Quinlan*, of Scott, Quinlan & Hecht, of Topeka, was on the brief for *amicus curiae*, plaintiffs.

The opinion of the court was delivered by

SIX, J.: This case interprets the Kansas Constitution. Topeka Country Club and Shawnee Country Club (Intervenors) assert that Kan. Const. Article 11, § 1(a)(4) (the Amendment), adopted in 1992, lowering real estate tax assessment rates for certain non-profit organizations, was self-executing. If the Amendment was self-executing, no enabling legislation was required, and Intervenors should have received tax relief on January 1, 1993. Intervenors also seek to enjoin the assessment of real property taxes and claim reimbursement for taxes paid. Our jurisdiction is under K.S.A. 20-3017. (Intervenors' motion to transfer to this court was granted.)

The district court held that the Amendment was not self-executing. We agree and affirm.

## FACTS

On November 3, 1992, Kansas voters approved a change in the Kansas Constitution that created several new categories of real property for tax assessment purposes. Assessment rates for certain not-for-profit organizations were lowered from 30% to 12%. On November 4, 1993, plaintiffs The Most Worshipful Grand Lodge of Ancient Free and Accepted Masons of Kansas and various other lodges sued the Board of County Commissioners of Shawnee County (County). The petition alleged: (1) the Amendment lowering their assessment rate was self-executing, (2) the legislature had failed to act in a responsible manner by not implementing the Amendment, and (3) the County was illegally assessing taxes against the plaintiffs at the higher rate. The petition also sought to enjoin the County from collecting taxes under the higher assessment rate. The Intervenors entered the case and asserted their own prayer for declaratory and injunctive relief.

After the case was filed, House Substitute for Senate Bill 157, L. 1994, ch. 333, which was intended to enable execution of the Amendment as of January 1, 1994, was enacted. The original plaintiffs were included in the 12% assessment category under the new law and abandoned their active role in the litigation. Intervenors' land actually and regularly used for recreational purposes was also included in the 12% assessment category. However, the Intervenors continued to seek relief for other real estate.

The parties submitted the case to the district court on the following joint stipulation of facts. The constitutional language at issue is in paragraph 1, section 1(a)(4) of the stipulation. The pertinent portion of the explanatory statement accompanying the Amendment is in paragraph 2 of the stipulation, subparagraph (1).

### STIPULATION OF FACTS

"1. A proposed Constitutional Amendment to the Kansas Constitution was submitted to the voters and passed in a general election on November 3, 1992. The Amendment, now found at Article 11, Section 1 of the Kansas Constitution, provided in relevant portions:

"System of Taxation; Classification; Exemption.

"Section 1. 'System of Taxation; Classification; Exemption.

'(a) The provisions of this subsection shall govern the assessment and taxation of property on and after January 1, 1993, and each year thereafter. Except as otherwise hereinafter specifically provided, the Legislature shall provide for uniform and equal basis evaluation and rate of taxation of all property subject to taxation. . . . Property shall be classified into the following classes for the purposes of assessment and assessed at the percentage of value prescribed therefor:

Class 1 shall consist of real property. Real property shall be further classified into seven subclasses. Such property shall be defined by law for the purpose of subclassification and assessed uniformly as to subclass at the following percentages of value:. . .

(4) Real property which is owned and operated by a not-for-profit organization not subject to federal income taxation pursuant to Section 501 of the federal internal revenue code, *and which is included in this subclass by law*—12%. [Emphasis added.]

(6) Real property used for commercial and industrial purposes and buildings and other improvements located upon land devoted to agricultural use—25%.'

See Constitution of the State of Kansas, Article 11, Section 1.

"2. The Public Notice which was published to explain the Constitutional Amendment, and which accompanied the Amendment on the ballot, provided in relevant portions:

Explanatory Statement. This amendment would revise the current property tax system providing for the classification and assessment of all property subject to taxation at different percentages of value.

A vote for the proposition would, as of January 1, 1993, continue the requirement that different classes of property are to be assessed for property tax purposes at different percentages of value. However, three new subclassifications of real property would be established, namely: '(1) Real property owned and operated by *certain* not-for-profit organizations the assessment rate for which would be decreased from 30% to 12%; . . .' [Emphasis added.]

(3) 'Real property used for commercial and industrial purposes and buildings and other improvements located upon land devoted to agricultural use the assessment rate for which would be decreased from 30% to 25%.'

A vote against the proposition would continue the current system of property taxation.

"3. Based upon the common language of the Amendment and Explanatory Statement, it was ambiguous that the Amendment required additional action by the legislature to give it effect—that the Amendment was not self-executing. In fact, following the adoption of the Amendment, it was not clear to all members of the Kansas Legislature whether the Amendment was self-executing, which prompted the solicitation by one legislator of an opinion by the Attorney General to determine whether the Amendment was or was not self-executing.

"4. Based upon the language of the Constitutional Amendment and of the Explanatory Statement provided, Kansas voters could reasonably believe, and some[1] did actually believe, that, with the adoption of the amendment of Article 11, Section 1 of the Kansas Constitution, all Section 501 Organizations as classified and defined in the Internal Revenue Code would be assessed at 12%, from and after January, 1993. The information on the ballots did not include a statement on whether enabling legislation would subsequently determine which nonprofit organizations' real estate was going to be assessed at the proposed 12% of its value.

"5. Organizations which are not subject to federal income tax pursuant to Section 501 actively campaigned for support of the Constitutional Amendment, including those under 501(c)(7) and those under Section 501(c)(2), (3), (4), (8) and

---

"[1] The parties are without sufficient information to stipulate as to whether 'some' of the voters referenced herein would equate to a majority, plurality or a minority of the voters in the 1992 election."

(10). Members of these organizations were encouraged to vote for the tax relief provided in the Amendment. Voters who are members of the various 501(c) organizations voted for the Constitutional Amendment believing that the Amendment would provide tax relief for their organizations. [Reference to Appendix 1, which included affidavits from members and managers of 501(c) organizations that supported stipulated facts 4, 5, 6, and 8.]

"6. The intent of some[2] of the voters in voting for the amendment of Article 11, Section 1 of the Kansas Constitution was to obtain tax relief for all not-for-profit organizations owning and operating real property in the State of Kansas, and not subject to federal income taxation pursuant to Section 501(c) of the internal revenue code.

"7. [Reference to Appendix 2, which included several Kansas newspaper articles published before the election that included discussion or explanation of the Amendment.]

"8. Based upon the language of the Amendment and Explanatory Statement, together with the published newspaper articles relating to the Amendment, some members of 501(c)(7) organizations believed, and voted for the Amendment based upon the belief, that the Amendment would provide tax relief for all 501(c) not-for-profit organizations which own and operate real property in the State of Kansas.

"9. The phrases, 'and which is included in the subclass by law,' 'as shall be provided by law,' and 'in a manner to be prescribed by law' are technical legal terms of art, used by legislatures to condition the execution of a constitutional provision upon enabling legislation to be passed at a later time.

"10. In 1993, the House of Representatives of the State of Kansas proposed, debated and passed original House Bill 2035 which reduced the assessment level beginning in tax year 1993 from 30% to 12% on real property owned and operated by not-for-profit organizations not subject to federal income taxation pursuant to Section 501(c)(3), (4), (8), and (10). The bill, as passed by both houses of the Kansas Legislature, provided in relevant portions:

> (1) (a) In accordance with and for the purposes of Section 1 of Article 2 of the Kansas constitution, real property, to the extent herein specified, which is owned and operated by a not-for-profit organization not subject to federal income taxation pursuant to paragraph (2), (3), (4), (8), or (10) of subsection (c) of Section 501 of the federal internal revenue code, as in effect on January 1, 1993, is hereby included in subclass (4) of class 1 for property tax classification purposes, and shall be assessed at the rate of 12% of its fair market value. With respect to real property owned and operated by a not-

---

"[2] The parties are without sufficient information to stipulate as to whether 'some' of the voters referenced herein would equate to a majority, plurality or a minority of the voters in the 1992 election."

for-profit corporation not subject to federal income taxation pursuant to paragraph (2) of subsection (c) of Section 501 of such Code, this section shall only apply to real property leased to a not-for-profit organization not subject to federal income taxation pursuant to paragraph (8) of subsection (c) of Section 501 of such Code. Nothing in this subsection shall be deemed to affect exemption of property by law or Kansas constitution.

(b) The provisions of this section shall apply to all taxable years commencing after December 31, 1992.

"11. On May 20, 1993, House Bill 2035 was vetoed by Governor Finney. Thus, in 1993 no legislation was implemented to effectuate Article 11, Section 1(a)(4) of the Kansas Constitution.

"12. As a result of the foregoing, real property used for commercial and industrial purposes and buildings, etc. (for profit) is being assessed at 25% of its value and all 501(c) entities' real estate (not-for-profit) is assessed at 30% of its value.

"13. Although Article 11, Section 1 of the Kansas Constitution was amended by the voters of Kansas, the Governor's veto of the Trifecta Bill resulted in no change in the status quo concerning the level of real estate tax assessments for nonprofit organizations for the calendar year 1993.

"14. In April, 1994, both Houses of the Kansas Legislature passed House Substitute for Senate Bill 157, a bill relating to the classification of real property owned by not-for-profit organizations for recoupment of property tax, and submitted it for approval and signature to the Governor. House Substitute for Senate Bill 157 provided, *inter alia*: [For the full statute, see K.S.A. 1995 Supp. 79-1439a, K.S.A. 1995 Supp. 79-1439b.]

On May 11, 1994, Governor Finney signed House Substitute for Senate Bill 157 into law. The act was published in the Kansas Register on May 19, 1994."

Intervenors are 501(c)(7) not-for-profit organizations. The original plaintiffs have filed an *amicus curiae* brief in this court, arguing that although the 1994 law provided the 1994 tax relief they believed they were entitled to, it did not do so for 1993.

## DISCUSSION

"A self-executing provision of a constitution is a provision requiring no supplementary legislation to make it effective and leaving nothing to be done by the legislature to put it [into] operation." *State, ex rel., v. Board of Education*, 212 Kan. 482, Syl. ¶ 3, 511 P.2d 705 (1973).

The interpretation of the Amendment is a question of law. Our review is unlimited. *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827,

831, 877 P.2d 430 (1994). The district court's ruling is based on a stipulation of facts. We have the same opportunity to examine and consider the evidence as did the district court and to determine de novo what the facts established. *Hudgens v. CNA/Continental Cas. Co.*, 252 Kan. 478, 481, 845 P.2d 694 (1993).

## The District Court's Decision

In the district court's memorandum decision, it quoted the parties' stipulated facts except for a portion of No. 3 concerning the ambiguity of the Amendment. Intervenors contend that the omission from the stipulated facts set out in the district court's decision indicated the court's failure to construe the Amendment as ambiguous. They also claim the district court failed to address the authorities they cited concerning construction of ambiguous constitutional provisions. The portion of stipulated fact No. 3 omitted from the district court's decision is set out below in italics:

"Based upon the common language of the Amendment and Explanatory Statement, *it was ambiguous that the Amendment required additional action by the legislature to give it effect—that the Amendment was not self-executing. In fact, following the adoption of the Amendment,* it was not clear to all members of the Kansas Legislature whether the Amendment was self-executing, which prompted the solicitation by one legislator of an opinion by the Attorney General to determine whether the Amendment was or was not self-executing."

The County responds that the district judge's omission was unintentional. According to the County, Intervenors could easily correct the problem with a motion pursuant to K.S.A 60-260(a). The omission appears to have been unintentional. The district court noted the ambiguity by observing: "[I]t was not clear to all members of the Kansas Legislature whether the Amendment was self-executing, which prompted the solicitation by one legislator of an opinion by the Attorney General to determine whether the Amendment was or was not self-executing." The district court did address the authorities cited by Intervenors in making its determination that the Amendment was not self-executing.

## The Amendment

Intervenors contend that the Amendment phrase "and which is

included in this subclass by law" must be self-executing because the parties stipulated the phrase was ambiguous. According to Intervenors, when the rules of construction are applied to the ambiguous phrase, the intent of the voters is obvious, and we must construe the phrase as self-executing. We disagree. Intervenors also stipulated that the phrase is a "technical" term of art used by legislatures to condition execution of a constitutional provision upon enabling legislation. (Stipulation, ¶ 9.) In addition, Intervenors contend that because voters would not understand the technical meaning of this phrase, the Amendment must be interpreted as self-executing. As the district court pointed out, even if some voters may not have understood the distinction between a self-executing and non-self executing provision, all voters are charged with understanding what they may be voting for. If the phrase has a clearly understood meaning, even though it may include technical terms, those technical terms should not make the phrase ambiguous. Regardless of what the parties have stipulated, this court defines constitutional provisions. *State v. Nelson*, 210 Kan. 439, 445, 502 P.2d 841 (1972).

Intervenors' analysis is flawed. The phrase "which is included in this subclass by law" cannot be ignored. Intervenors argue that: (1) the only ambiguous portion of the Amendment is the subclass phrase; and (2) without the "ambiguous" subclass phrase, the reduced assessment clearly applies to all 501(c) not-for-profit organizations. Intervenors argument violates a cardinal rule of construction: "When interpreting the constitution, each word must be given due force and appropriate meaning." *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 660, 802 P.2d 584 (1990).

Intervenors sidestep the Amendment's explanatory statement, which said that the new subclassification of real property would decrease the assessment rate from 30% to 12% for "real property owned and operated by *certain* not-for-profit organizations." (Emphasis added.) Intervenors disregard the word "certain," reasoning that "certain" refers only to "not-for-profit organizations not subject to federal income taxation pursuant to § 501 of the federal internal revenue code," conveniently avoiding the Amendment's

phrase *"which is included in this subclass by law."* (Emphasis added.)

Intervenors submit various voter affidavits as intent indicators on the meaning of the Amendment. Of the 14 affidavits, all but 3 are associated with 501(c) organizations. Intervenors do not indicate how the affiants were selected. These affidavits are not a representative sample of Kansas voters and have little value as evidence of voters' intent.

### Legislative History

Intervenors misinterpret the legislative history of the Amendment and also the contemporaneous construction the legislature gave to the Amendment. "The importance of understanding the intentions of the legislature in proposing the amendment cannot be understated." *State ex rel. Stephan v. Finney,* 254 Kan. 632, 655, 867 P.2d 1034 (1994).

The legislative history is significant. Beginning in 1990, certain fraternal organizations requested property tax relief from the legislature. These organizations were generally classified as 501(c)(8) or 501(c)(10) organizations under the Internal Revenue Code. The *Kansas House Committee on Taxation introduced a proposed constitutional amendment, 1991 House Concurrent Resolution 5007, which reduced the tax assessment rate for 501(c)(8) and 501(c)(10) organizations. See House J. 1992, p. 2652. A representative of the Topeka Woman's Club, a 501(c)(4) organization, testified before the committee, requesting tax relief. The committee then revised the proposed amendment to the present form. An explanation of this revision stated:

"House Taxation Committee amendments included . . . changing the eligibility for the proposed assessment level for certain not-for-profits from only those organized under 501(c)(8) and 501(c)(10) *to only those defined by statute* which are organized under any provision of 501(c) and reducing the proposed assessment level from 15 to 12 percent . . . ." Supplemental Note on House Concurrent Resolution No. 5007 (1992), as amended by Senate on Final Action. (Emphasis added.)

We find nothing in the legislative history to support the contention that all 501(c) organizations were to be granted the reduced assessment rate.

After the Amendment was adopted, the legislature twice attempted to pass enabling legislation. See stipulation of facts 9 through 14. The Governor vetoed the first attempt in 1993 but signed the second attempt in May 1994. Neither bill granted the reduced assessment rate to all 501(c) organizations. The enabling legislation in 1993 and 1994 indicates legislative intent that the Amendment was not self-executing.

## Other Sections of Art. 11, § 1(a)

Intervenors argue that because other portions of Art. 11, § 1(a) are clearly self-executing, the Amendment must also be self-executing. For example, Article 11, § 1(a)(6) reduces the assessment rate for "[r]eal property used for commercial and industrial purposes and buildings and other improvements located upon land devoted to agricultural use" to 25%. This provision is self-executing. A constitutional provision may be self-executing in one part and not self-executing in another part. *State, ex rel., v. Board of Education*, 212 Kan. at 486.

The fact that other portions of Article 11, § 1(a) may be self-executing does not control the character of the Amendment.

## Attendant Circumstances

Intervenors also submit newspaper articles published before the election as evidence of the "attendant circumstances" surrounding the adoption of the Amendment. The newspaper article quotations do not say that all not-for-profit organizations were to be granted the reduced assessment rate. The articles generally indicate that the reduced assessment was to be granted to fraternal organizations, not to all 501(c) organizations.

The attendant circumstances relating to the legislature's drafting of the resolution proposing the Amendment require examination when construing the Amendment. See *Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11, 19, 360 P.2d 456 (1961).

The movement to propose the Amendment began through the efforts of fraternal organizations. The legislature's objective was to propose an amendment that granted the requested relief but left

the legislature, through enabling legislation, a way to limit the relief to certain—not all—not-for-profit organizations.

## Analysis

Intervenors argue that when there is a conflict between the legislative intent behind a constitutional amendment and the intent and understanding of the voters, the latter must control. However, Intervenors have failed to show that the common understanding of Kansans adopting the Amendment differs from the language of the Amendment or the legislative intent of its drafters. In construing a constitutional provision, we consider the circumstances attending its adoption and what appears to have been the common understanding of the voters. See *Colorado Interstate Gas Co.*, 247 Kan. at 660. Based on what Intervenors have presented, there is no conflict between the voters' understanding, the language of the Amendment, and the legislative intent behind it.

In *Woodworth v. Bowles*, 61 Kan. 569, 60 Pac. 331 (1900), we considered whether the following constitutional provision was self-executing: "Dues from corporations shall be secured by individual liability of the stockholders to an additional amount equal to the stock owned by each stockholder, and such other means as shall be provided by law." 61 Kan. at 572. A group of creditors filed suit in equity against the stockholders of an insolvent bank, seeking payment from the stockholders, to be applied to the bank's indebtedness to the creditors. There was no statutory authority for such a lawsuit. The creditors argued the above constitutional provision was self-executing, authorizing the lawsuit. We reversed the district court's judgment for the creditors, determining that the provision was not self-executing:

"When the constitution declares that a right shall be secured or a thing shall be done, it means that it shall be secured or shall be done, by the legislature. In such case, the constitution places upon the legislature the obligation to carry out its ordinances by appropriate enactment." 61 Kan. at 574.

The Amendment's phrase "which is included in this subclass by law" means "which is included in this subclass by the legislature."

We acknowledge a degree of ambiguity in the interplay of the Amendment and the explanatory statement. Although the explan-

atory statement could have benefitted from that skillful wordsmith "Professor Hindsight," we encounter no difficulty in holding the Amendment is not self-executing. Enabling legislation is required. The House Substitute for Senate Bill 157 (K.S.A. 1995 Supp. 79-1439a and K.S.A. 1995 Supp. 79-1439b) was that enabling legislation and is constitutional.

Affirmed.

LOCKETT, ABBOTT, and LARSON, JJ., not participating.

JERRY G. ELLIOTT, GARY W. RULON, and ROBERT L. GERNON, Judges of the Kansas Court of Appeals, assigned.