No. 81,779

PRESBYTERIAN MANORS, INC., *Appellant,* v. DOUGLAS COUNTY, KANSAS, *Appellee.*

(998 P.2d 88)

Opinion filed February 4, 2000.

*Kasey Alan Rogg,* of Martin, Churchill, Blair, Hill, Cole & Hollander, Chartered, of Wichita, argued the cause, and *Paul C. Herr, J. Michael Kennalley* and *W. Stanley Churchill,* of the same firm, were on the briefs for appellant.

*Evan H. Ice,* of Stevens & Brand, L.L.P., of Lawrence, argued the cause and was on the briefs for appellee.

*Jeffrey A. Chanay,* of Entz & Chanay, P.A., of Topeka, was on the brief of *amicus curiae* Kansas Association of Homes and Services for the Aging, Inc.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Presbyterian Manors, Inc., appeals from an order of the Board of Tax Appeals (BOTA) denying a property tax exemption for its adult care home and housing for the elderly facility in Lawrence, Kansas. The court transferred this case from the Court of Appeals, pursuant to K.S.A. 20-3018(c).

BOTA concluded that Presbyterian Manors did not qualify for property tax exemption under K.S.A. 79-201b because it "neither charges for its services an amount which, in the aggregate, is less than its costs, nor provides it[s] services to residents at the lowest feasible cost." On appeal, the issue is whether the facility in Lawrence operated at the "lowest feasible cost." Presbyterian Manors does not quarrel with BOTA's conclusion that it did not charge its residents an amount less than the actual operating cost.

BOTA's order includes findings of fact, which have not expressly been challenged by Presbyterian Manors. The following relevant findings are from BOTA's order:

"[Presbyterian Manors] has submitted evidence that the property at issue will be used exclusively as an adult care home and for elderly housing purposes. . . . [T]he applicant's nursing home facility is currently licensed in accordance with K.S.A. 39-923.

". . . Presbyterian Manor[s] is a not-for-profit corporation organized in Kansas.

". . . Presbyterian Manor[s] has submitted evidence that it is exempt from paying federal income tax under I.R.C. 501(c)(3) by virtue of satisfying the federal definitions of 'charitable' and 'religious.' . . . [C]ontributions to this type of nonprofit organization are deductible for federal income tax purposes, and consequently for state income tax purposes . . . ."

BOTA reviewed Presbyterian Manors' audited financial statements for fiscal years 1993 through 1997 and its net operating income for 1977 through 1997. "The Board finds that the sum of Presbyterian Manor[s'] overall operations resulted in a net income of $45,870. The Board further finds that for the past 3 years, the applicant has experienced a net income from overall operations of $534,562." On the basis of these findings, BOTA concluded that "Presbyterian Manor[s] is not operating below its cost of operation."

BOTA's summary of Presbyterian Manors' finances shows that for the years 1995 through 1997, operations income was $138,005, $269,617, and $126,940, respectively. Investment earnings were $103,001, $108,044, and $80,124, respectively.

"13. The Board finds that while the cumulative net income from operations alone is not incredibly high, the net income from operations figures for fiscal years 1995 through 1997 are substantial. The Board also finds that when investment

earnings are added in, the net income figures for 1995 through 1997 are quite large, as is the cumulative total net income. Finally, the Board finds that the applicant's Fund Balance is very large, $2,682,360 in 1995; $3,103,014 in 1996; and $3,321,544 in 1997. The applicant stated during the hearing that some of the money that has been built up will be used for imminent repairs. However, the applicant's estimates for these repairs made up less than half of the built up net income. The Board also notes that some of the Fund Balance, although not all of it[,] is made up of donor restricted monies.

"14. The Board further finds that the applicant has substantial current assets in comparison to its current liabilities.[2] The applicant had a current ratio of 12.5 to 1 in 1995, 12.1 to 1 in 1996, and 9.8 to 1 in 1997. This ratio is an indicator of the applicant's solvency. The applicant's current ratio indicates that it had sufficient cash on hand or assets readily convertible to cash to meet its current obligations nine to twelve times over on June 30, 1995, 1996, and 1997. Furthermore, the applicant's total liabilities have decreased substantially over this three year period.[3]"

The footnotes state:

"[2]The applicant had current assets of $2,546,870 in 1995, $2,319,398 in 1996, and $2,413,343 in 1997. The applicant had current liabilities of $203,833 in 1995, $191,410 in 1996, and $246,065 in 1997.

"[3]The applicant's total liabilities were $6,828,132 in 1995, $5,941,771 in 1996, and $3,340,166 in 1997."

On the basis of these findings, BOTA concluded that Presbyterian Manors "is not providing services to its residents at the lowest feasible cost. The applicant's financial statements indicate that the applicant has more than sufficient income to make substantial improvements and sizably reduce its debt."

BOTA further remarked that "the financial evidence submitted to the Board indicates that the applicant is operating more profitably than an entity confined to operating at its lowest feasible cost."

Presbyterian Manors filed a petition for reconsideration, suggesting the legislative history of K.S.A. 79-201b *Second* and *Fifth* showed that the term "lowest feasible cost" was to be construed according to Rev. Rul. 72-124 of the Internal Revenue Code. BOTA summarily denied reconsideration for lack of new evidence. One Board member wrote a concurring opinion for the purpose of "elaborat[ing] on the 'lowest feasible cost' analysis." The concurring member prefaced her opinion as follows:

"According to the petitioner, the legislative history of K.S.A. 79-201b dictates that Revenue Ruling 72-124 is the sole basis for determining whether an applicant seeking exemption from ad valorem property tax is providing its services to residents at the lowest feasible cost. I do not agree that the analysis is so limited. While the legislative history does make reference to Revenue Ruling 72-124, the express language of the statute does not. I do not believe the Legislature intended to limit our inquiry so narrowly. However, even if Revenue Ruling 72-124 is determined to be the controlling analysis, I do not agree with the petitioner's argument that the Board's analysis is inconsistent in any way with that ruling."

During the 1999 session, the legislature amended the statute in question by adding a retroactive provision that affects this court's consideration of BOTA's decision. Here are pertinent portions of the statute showing the changes:

"The following described property, to the extent herein specified, shall be and is hereby exempt from all property or ad valorem taxes levied under the laws of the state of Kansas:

. . . .

"*Second.* All real property, and tangible personal property, actually and regularly used exclusively for adult care home purposes by an adult care home . . . which is operated by a corporation organized not for profit under the laws of the state of Kansas . . . charges to residents for services of which produce an amount which in the aggregate is less than the actual cost of operation of the home or the services of which are provided to residents at the lowest feasible cost, taking into consideration such items as reasonable depreciation, interest on indebtedness, acquisition costs, interest and other expenses of financing acquisition costs, lease expenses and costs of services provided by a parent corporation at its costs, *and* contributions to which are deductible under the Kansas income tax act; . . . . *For purposes of this paragraph and for all taxable years commencing after December 31, 1976, an adult care home which uses its property in a manner which is consistent with the federal internal revenue service ruling 72-124 issued pursuant to section 501(c)(3) of the federal internal revenue code, shall be deemed to be operating at the lowest feasible cost. . . .*

. . . .

"*Fifth.* All real property and tangible personal property, actually and regularly used exclusively for housing for elderly persons, which is operated by a corporation organized not for profit under the laws of the state of Kansas . . . in which charges to residents produce an amount which in the aggregate is less than the actual cost of operation of the housing facility or the services of which are provided to residents at the lowest feasible cost, taking into consideration such items as reasonable depreciation and interest on indebtedness and contributions to which are deductible under the Kansas income tax act; and all intangible property including moneys, notes and other evidences of debt, and the income therefrom,

belonging exclusively to such corporation and used exclusively for the purpose of such housing. *For purposes of this paragraph and for all taxable years commencing after December 31, 1976, an adult care home which uses its property in a manner which is consistent with the federal internal revenue service ruling 72-124 issued pursuant to section 501(c)(3) of the federal internal revenue code, shall be deemed to be operating at the lowest feasible cost.*" L. 1999, ch. 154, § 74.

BOTA's decision and its order denying reconsideration in this case were issued in 1998. Thus, the statutes had not yet been modified to make Rev. Rul. 72-124 the controlling standard. Because BOTA is a specialized agency for the purpose of deciding taxation issues, the court generally gives its decisions deference on tax questions unless BOTA's interpretation is erroneous as a matter of law. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 (1997).

This case presents an unusual situation where the amended statutes that actually control the outcome were not considered by BOTA. Rather than remanding the case for further consideration by BOTA, we will review BOTA's decision to determine whether its analysis and outcome are consistent with the amended statutes. It appears from the concurring opinion on the motion for reconsideration that, to some extent, Rev. Rul. 72-124 entered into BOTA's deliberations. In addition, the standard of review on questions of law, such as statutory interpretation, requires our independent and unlimited consideration. We bear in mind that tax exemption statutes are to be strictly construed in favor of imposing the tax and against allowing the exemption for one who does not clearly qualify. *In re Tax Appeal of Harbour Brothers Constr. Co.*, 256 Kan. 216, 223, 883 P.2d 1194 (1994).

Rev. Rul. 72-124 explains the requirements that "homes for the aged" must meet to qualify for exemption under section 501(c)(3) of the Internal Revenue Code. Rev. Rul. 72-124, 1972-1 C.B. 145 (prefatorial note). The gist of the ruling is that such an organization, otherwise qualified for charitable status under I.R.C. § 501(c)(3), will qualify for charitable status if it operates so as to satisfy the three primary needs of aged persons—housing, health care, and financial security. 1972-1 C.B. 146.

Housing may be satisfied by residential facilities designed "to meet some combination of the physical, emotional, recreational, social, religious, and similar needs of aged persons." 1972-1 C.B. 146-47. There is no dispute that Presbyterian Manors meets this requirement.

Health care may be satisfied either by providing some form of health care or by maintaining arrangements with other facilities, organizations, or health personnel for the care of residents. 1972-1 C.B. 147. There is no dispute that Presbyterian Manors meets this requirement.

Financial security is the need in question. The pertinent portion of the revenue ruling states:

"The need for financial security, i.e., the aged person's need for protection against the financial risks associated with later years of life, will generally be satisfied if two conditions exist. First, the organization must be committed to an established policy, whether written or in actual practice, of maintaining in residence any persons who become unable to pay their regular charges. This may be done by utilizing the organization's own reserves . . . .

"As to the second condition respecting the provision of financial security, the organization must operate so as to provide its services to the aged at the lowest feasible cost, taking into consideration such expenses as the payment of indebtedness, maintenance of adequate reserves sufficient to insure the life care of each resident, and reserves for physical expansion commensurate with the needs of the community and the existing resources of the organization. In case of doubt as to whether the organization is operating at the lowest feasible cost, the fact that an organization makes some part of its facilities available at rates below its customary charges for such facilities to persons of more limited means than its regular residents will constitute additional evidence that the organization is attempting to satisfy the need for financial security, provided the organization fulfills the first condition regarding the provision of financial security. The amount of any entrance life care, founder's, or monthly fee charged is not, *per se*, determinative of whether an organization is operating at the lowest feasible cost, but must be considered in relation to all items of expense, including indebtedness and reserves." 1972-1 C.B. 147.

The first part of the financial security test—the organization is committed to an established policy of maintaining in residence any persons who become unable to pay their regular charges—is met by Presbyterian Manors. The chief financial officer for Presbyterian Manors testified that the corporation's published policy and

practice with regard to residents who become unable to pay the listed rates is to permit them to remain in the facility "with peace and dignity" for life. BOTA made no finding contrary to this testimony.

The second part of the financial security test—the organization is operating so as to provide its services at the lowest feasible cost—is the crux of this appeal. The revenue ruling directs taking into consideration expenses such as payment of indebtedness, maintenance of adequate reserves sufficient to insure the life care of each resident, and reserves for physical expansion in making a determination of the lowest feasible cost. 1972-1 C.B. 147. Rev. Rul. 72-124 does not anticipate that adult care homes will operate in the red. It allows the following ordinary uses for net earnings: "to improve the care provided, retire indebtedness, subsidize any resident unable to continue making his monthly payments, or expand the facilities of the home where the needs of the community warrant such expansion." 1972-1 C.B. 146-47. Rev. Rul. 72-124 also requires that the fees charged to residents be considered in relation to expenses, including indebtedness and reserves. 1972-1 C.B. 147.

Rev. Rul. 72-124 sets out the requirements that must be met by an adult care home and housing for the elderly facilities in order to qualify for exemption under 501(c)(3). The 1999 amendment does not equate a 501(c)(3) federal income tax exemption with a 79-201b *Second* or *Fifth* property tax exemption. In other words, the granting of the 501(c)(3) exemption is not controlling as to the granting of a property tax exemption under 79-201b *Second* or *Fifth*. However, Rev. Rul. 72-124 is no longer simply referenced by the use of "lowest feasible cost" but is expressly set out in the statute and mandates that an exemption be granted where the use of the property is consistent with the requirements of Rev. Rul. 72-124. We believe the legislature clearly intended that the granting of a federal income tax exemption under 501(c)(3) be given great weight in the consideration of an application for exemption under 79-201b *Second* and *Fifth*.

The evidence presented to BOTA by Presbyterian Manors that bears on this issue may be found in the financial records offered and the testimony of its chief financial officer. It appears that

BOTA relied for its net income from operations, investment earnings, and net income figures on the pared down Annual Operational Analysis for fiscal years 1977 through 1997.

Review of the Lawrence facility's financial records reveals what appears to be significant error in one of the dollar amounts cited by BOTA in support of its conclusion. Paragraph 14 of BOTA's order concludes: "Furthermore, the applicant's total liabilities have decreased substantially over this three year period[3]. . . .[3]The applicant's total liabilities were $6,828,132 in 1995, $5,941,771 in 1996, and $3,340,166 in 1997." In other words, BOTA believed that total liabilities were cut by more than half—by $3,487,966—from 1995 to 1997. In fact, BOTA's figure for total liabilities in 1997 is in error. The 1995 balance sheet shows the figure used by BOTA—$6,828,132—as Current YTD Total Liabilities. The 1996 and 1997 balance sheets differ from the 1995 balance sheet in format. The 1996 balance sheet does not actually show the figure used by BOTA—$5,941,771—but it can be calculated by subtracting the figure for Total Fund Balance from the figure for Total Liabilities & Fund Balance. If the same calculation is performed using the figures from the 1997 balance sheet, the total liabilities are $5,762,551. The difference between this figure and BOTA's is nearly $2.5 million. BOTA was not in error in concluding that total liabilities have decreased from 1995 through 1997, but the decrease was from $6,828,132 to $5,762,551 rather than from $6,828,132 to $3,340,166.

Evidence offered by Presbyterian Manors that does not appear in BOTA's decision is relevant to the organization's improved financial condition in recent years. The financial officer attributed rising fortunes to a combination of happenstance and sound business practices. Among the factors not directly controllable by Presbyterian Manors were the occupancy rate and the level of health services required by residents. Presbyterian Manors budgets to break even at less than full capacity so that full occupancy may generate more than break-even income. Similarly, when "higher acuity" services are provided to residents, more income is generated. Among the controllable factors were several recently initiated programs, including improved maintenance procedures, group

purchasing, and self-insurance. He also testified that Presbyterian Manors had refinanced its industrial revenue bonds to get a lower interest rate.

The Presbyterian Manors officer testified that the financial gains of recent years could be affected by any number of factors. He noted that one workers compensation claim could reverse the reduced costs from self-insurance. He noted that Presbyterian Manors was in the process of becoming licensed for an assisted living unit. Additional regulations would apply to it, and more skilled nursing staff would be required. Thus, higher labor costs were anticipated. In addition, minimum wage increases could hike labor costs. The most recent wage increase was reflected for less than 1 year in the financial records reviewed by BOTA. He testified that Presbyterian Manors was using its current financial health for building reserves for workers compensation claims, maintenance, higher labor costs, and repairs. The figure for deferred maintenance costs at the time of the BOTA hearing was $620,000.

Presbyterian Manors' financial officer was of the opinion that its residents were provided housing and care at the lowest feasible cost. He testified that Presbyterian Manors worked to find and implement ways to decrease costs. He noted that the savings from Presbyterian Manors' good business practices resulted in smaller fee increases for its residents than for residents in similar facilities.

In summary, the financial officer testified that the organization's implementation of good business practices had trimmed costs in recent years, which was a principal factor in the increased income. He was of the opinion that Presbyterian Manors would have shown a loss were it not for implementation of the good business practices. He believed it also was sound practice to maintain fees at a level high enough to anticipate future needs and based on less than full occupancy.

In considering whether BOTA's analysis of the financial evidence conforms to the revenue ruling, at least two questions come to mind. One is the length of time that should be taken into consideration. There is no guidance on this question in the revenue ruling. BOTA's consideration corresponds neatly with the periods of time that supported the conclusion and excluded financial evi-

dence from time periods that might offer less support for the decision. In a related matter, long enough periods were considered to suggest trends, but there was no systematic analysis of observed and anticipated changes in the taxpayer's financial condition. The lack of analysis was due at least in part to Presbyterian Manors' failing to provide evidence about the increased revenue and Fund Balance, and whether and precisely how that fit into the short- and long-term plans for the organization. We do not believe the legislature intended to discourage charitable organizations from operating according to sound business principles and practices, and yet that could be the result if long-term planning is discouraged by adverse tax consequences. We reject BOTA's limited analysis. As noted by Presbyterian Manors when these parties were last before the appellate courts, Douglas County contended that the court "should look at the entire 11-year life of the Manor." *In re Tax Exemption Application of Presbyterian Manor, Inc.*, 16 Kan. App. 2d 710, 715, 830 P.2d 60 (1992) The entire historical record should be considered in determining if the use was consistent with Rev. Rul. 72-124.

We also question certain shortcomings of BOTA's analysis of financial evidence and where its analysis strays from the federal revenue ruling.

BOTA isolated net income from operations figures for fiscal years 1995 through 1997 and found them to be "substantial." It did not take into account that Presbyterian Manors experienced a net loss from operations in fiscal year 1994 of $169,914. BOTA's only comment about the 21-year total net income from operations was that it "is not incredibly high." BOTA took no notice that the 21-year total net income from operations is scarcely more than 1/10th of 1% of total operating revenues.

BOTA discounted evidence that some of Presbyterian Manors' earnings "will be used for imminent repairs" on the ground that repair estimates totalled "less than half of the built up net income." Although Presbyterian Manors' evidence of intended repairs is not a wholly satisfying explanation of uses for its net earnings, that evidence must be taken together with evidence of other intended uses for the purpose of determining whether the property is being

used in a manner that is consistent with Rev. Rul. 72-124. The chief financial officer testified that any net income from operations is "reinvest[ed] into the facilities, into the people, into the service we provide to those residents." Although this testimony lacks specificity, it should not have been ignored by BOTA, as it seems to have been.

BOTA focused on the size of Presbyterian Manors' Fund Balance, which was $3,321,544 in 1997. It noted that some, but not all, of the Fund Balance was donor-restricted money, but did not indicate the breakdown or its significance. BOTA dwelled on the ratio of current assets to current liabilities—12.5 to 1 in 1995; 12.1 to 1 in 1996; and 9.8 to 1 in 1997—as proof of Presbyterian Manors' solvency. In addition, BOTA focused on the decrease in total liabilities from 1995 through 1997. As we have seen, BOTA miscalculated the total liabilities for 1997. It did not mention that (the miscalculated) total liabilities in 1997, despite the decrease from 1995, still exceeded the Fund Balance ($3,340,166 to $3,321,544). When the correct figure is used, the 1997 total liabilities far exceed the Fund Balance ($5,762,551 to $3,321,544). It is not clear that the Fund Balance and the ratio of current assets to current liabilities, on which BOTA placed heavy reliance, actually are relevant factors for consideration under the revenue ruling, which emphasizes comparison of fees charged to expenses, including indebtedness and reserves.

Counsel for Douglas County stated in response to a Board member's question that the Presbyterian Manors facilities in Douglas County previously had been exempted from property tax and that the county revisited the question because "we've seen net operating cash flow over—over six of the last seven years." In a response letter to Presbyterian Manors' letter calling the statutory modifications to the court's attention, counsel for the county characterized Presbyterian Manors' operating profits over the last several years as "enormous." The court is urged to conclude on that basis that Presbyterian Manors is not operating at its lowest feasible cost. The Annual Operational Analysis shows through 1997 that 5, rather than 6, of the last 7 years produced a net income from operations. The same is true of the last 10 years—net income from operations

for 5 of 10 years and net loss from operations for 5 years. The difference between net income and net loss from operations in those 10 years was $320,164, with the lowest net income from operations of the 5 income-producing years being the most recent year, 1997. We cannot, on this basis, conclude that Presbyterian Manors was not providing its services at its lowest feasible cost. The revenue ruling requires comparing fees charged to expenses, including indebtedness and reserves. It does not appear that either the county or BOTA has analyzed Presbyterian Manors' finances in conformity with the revenue ruling.

In its order, BOTA finds Presbyterian Manors meets all the requirements for an exemption save one. The exemption was denied because Presbyterian Manors' operation of the property in question was "more profitabl[e] than an entity confined to operating at its lowest feasible cost." BOTA's analysis ignores that as a nonprofit corporation, any "profit" must be used to benefit the residents and will not go to any private individual or shareholder. It gives no weight to Presbyterian Manors' receiving a federal income tax exemption under I.R.C. § 501(c)(3). Although not controlling, it should be given great weight since the Internal Revenue Service has determined that Presbyterian Manors is using the property in question consistently with Rev. Rul. 72-124.

We find from a review of the record that it does not support BOTA's conclusion that Presbyterian Manors failed "to satisfy the lowest feasible cost requirement imposed by K.S.A. 79-201b *Second* and K.S.A. 79-201b *Fifth*." To the contrary, substantial evidence leads to the conclusion that Presbyterian Manors' use of the property in question is consistent with Rev. Rul. 72-124. For that reason, we hold that BOTA's order is not supported by substantial evidence and the order should be reversed. Presbyterian Manors has met its burden for an exemption under K.S.A. 79-201b *Second* and *Fifth*.

The order of BOTA denying Presbyterian Manors' application for exemption under K.S.A. 1999 Supp. 79-201b *Second* and *Fifth* is reversed.

ABBOTT and DAVIS, JJ., not participating.

GARY W. RULON, J., and MARLA J. LUCKERT, District Judge, assigned.