(112 P.3d 951)
No. 91,569

MAIN LINE, INC., *Appellant*, v. BOARD OF RENO COUNTY COMMISSIONERS, *Appellee.*

MAIN LINE, INC., *Appellant*, v. BOARD OF RICE COUNTY COMMISSIONERS, *Appellee.*

Opinion filed October 1, 2004.

*Robert J. O'Connor* and *Geron J. Bird*, of Stinson Morrison Hecker LLP, of Wichita, for appellant.

*Richard A. Benjes*, of Hutchinson, for appellee.

Before JOHNSON, P.J., MALONE and HILL, JJ.

JOHNSON, J.: Main Line, Inc., appeals the district court's affirmation of the Board of Tax Appeals' (BOTA) classification of Main Line's rental real estate as commercial, rather than as property owned and operated by a not-for-profit corporation. Specifically, Main Line contends that BOTA erred in finding that Main Line

did not operate the real property and erred in refusing to grant relief retroactively. We affirm.

Main Line was a for-profit corporation that held rental property, generating total revenues in 1997 of approximately 2.5 million dollars. In June 1998, Main Line's depreciable property was valued in excess of 10 million dollars. Health Care, Inc., a not-for-profit corporation, purchased a 100% interest in Main Line and converted it into a tax-exempt not-for-profit organization. Main Line's application for tax exempt status was dated November 27, 1998. Main Line's brief supports many of its factual contentions by citing to its entries in the tax exemption application. Based upon the information in that application, the Internal Revenue Service (IRS) issued a letter ruling, determining Main Line to be exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code (IRC). 26 U.S.C. § 501(c)(3) (2000).

Main Line owns medical equipment, land, and buildings, all of which are leased to Hutchinson Clinic, P.A. (Clinic), a Kansas for-profit corporation. Main Line's only source of operating revenue is the rental income from the Clinic, albeit the tax exemption application asserts that, if needed, potential cash infusions are available from Health Care, Inc. The rental agreement is governed by a 30-year Master Facilities Lease (lease), which contains provisions effecting a common commercial lease arrangement, known as a triple-net lease, whereby the tenant is responsible for paying the insurance, taxes, and repairs. Specifically, the Clinic is obligated to pay "all taxes and assessments, general and special, which may be lawfully taxed, charged, levied, assessed or imposed upon or against or payable for or in respect of the Leased Property or any part thereof." If the Clinic fails to perform any of its duties under the lease, then Main Line has the option, but not the obligation, to perform the duties.

The lease included three parcels of real estate in Reno County and one parcel in Rice County. In mid-2001, Main Line commenced the process to challenge the rate at which ad valorem taxes were assessed against its real estate. Specifically, in June 2001, Main Line filed an equalization appeal on the Reno County parcels, challenging the 2001 assessment. Two months later, Main Line

filed applications protesting payment of the 2000 ad valorem taxes on the three Reno County parcels, and on September 25, 2001, it applied for relief on the same parcels for the 1999 tax year. With respect to the Rice County parcel, Main Line filed a protest on August 7, 2001, challenging the 2000 tax assessment, and a month later applied for relief for the 1999 tax.

Before BOTA, Main Line filed for summary judgment, and the Counties filed a motion to dismiss for lack of jurisdiction. BOTA dismissed the appeals for the 1999 tax year, as well as the 2000 appeal on one parcel for which Main Line had previously filed and then dismissed an equalization appeal. Main Line's remaining claims were denied on the merits.

After Main Line's motion for reconsideration was denied, it filed a timely petition for judicial review in Reno County. The Kansas Supreme Court ordered the consolidation of the Rice County and Reno County cases. After hearing oral arguments and reviewing the evidence, the district court sustained BOTA's findings.

## STANDARD OF REVIEW

The core issue presented is whether Main Line operated the land, as required by K.S.A. 79-1439(b)(1)(D) to receive a favorable 12% tax rate. To resolve the question, we must interpret the statute. We give weight and consideration to BOTA's interpretation of a statute, but the final construction of a statute rests with the courts. See *Lario Enterprises, Inc. v. State Bd. of Tax Appeals*, 22 Kan. App. 2d 857, 860, 925 P.2d 440, *rev. denied* 261 Kan. 1085 (1996). Courts construe statutes imposing a tax strictly in favor of the taxpayer. *In re Tax Appeal of Harbour Brothers Constr. Co.*, 256 Kan. 216, 223, 883 P.2d 1194 (1994). On the other hand, tax exemption statutes are construed strictly in favor of imposing the tax and against allowing the exemption for one who does not clearly qualify. *Presbyterian Manors, Inc. v. Douglas County*, 268 Kan. 488, 492, 998 P.2d 88 (2000).

## OPERATION OF PROPERTY

The assessed valuation of Main Line's real estate for ad valorem tax purposes was computed at 25% of its value, which is the as-

sessment rate for commercial property. K.S.A. 79-1439(b)(1)(F). Main Line argues that it fit within a special classification applicable to certain tax-exempt organizations pursuant to K.S.A. 79-1439(b)(1)(D). That provision is the enabling statute for Kan. Const. art. 11, § 1(a)(4) (2003 Supp.), and provides, in pertinent part:

"(b) Property shall be classified into the following classes and assessed at the percentage of value prescribed therefor:

(1) Real property shall be assessed as to sub-class at the following percentages of value:

. . . .

(D) real property which is owned and operated by a not-for-profit organization not subject to federal income taxation pursuant to section 501 of the federal internal revenue code and included herein pursuant to K.S.A. 79-1439a, and amendments thereto, at 12%." K.S.A. 79-1439.

K.S.A. 79-1439a limits the 12% tax rate to organizations that are granted tax-exempt status under 6 of the 27 subsections of IRC 501(c); IRC 501(c)(3) is one of the 6 subsections listed for special treatment. Main Line is, at least for purposes of this opinion, an IRC 501(c)(3) organization. IRC 501(c)(3) provides:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3).

If K.S.A. 79-1439(b)(1)(D) simply applied the 12% assessment rate to real property *owned* by a qualifying tax-exempt organization, our analysis would be complete; Main Line would qualify for the rate. However, the statute makes the additional requirement that the real property must be *operated* by the qualifying not-for-profit, tax-exempt organization.

In a vacuum, one would intuit that a tax-exempt organization is not operating the property. A professional association of medical care providers has possession of the real estate and is actively utilizing it to generate income, presumably with the goal of earning profits for the Clinic's beneficial owners. Main Line's role in the real estate's operation is simply to receive passive income from the property in the form of rents. It is difficult to perceive how Main Line's rental of its assets to a for-profit enterprise is in furtherance of the tax-exempt IRC 501(c)(3) purpose for which Main Line is ostensibly organized and exclusively operating. Accordingly, the arrangement does not comport with the spirit of our state's legislation designed to foster the religious, charitable, etc. activities contemplated in IRC 501(c)(3).

However, language in prior cases dealing with distinguishable fact patterns and often addressing different statutory provisions has provided Main Line with fuel to drive its arguments that it should be deemed to have operated the subject real property. Main Line contends that the statutory operation requirement can be met in more than one way. We perceive Main Line's arguments to be that its leasing of the property can fulfill the "operated" requirement; that through the relationship between Main Line and the Clinic, the Clinic can perform the operation requirement on behalf of Main Line; and that the Clinic's independent operations fulfill the statutory requirement.

BOTA found that Main Line's leasing of the land to the Clinic did not constitute an operation of the land. The agency noted that the lease required the Clinic to pay the taxes and opined that Main Line's discretion to enforce the lease provisions was not tantamount to operating the land. BOTA observed that the triple-net lease provision would give the benefit of the lower tax rate to the Clinic, which was responsible for paying the property taxes but which was not tax-exempt under IRC 501(c)(3). BOTA found this situation contravened legislative intent. See *Most Worshipful Grand Lodge v. Board of Shawnee County Comm'rs*, 259 Kan. 510, 518-19, 912 P.2d 708 (1996) (stating that legislative history of Kan. Const. art. 11, § 1[a][4] indicates intent to give tax relief to certain

not-for-profits organized under section 501[c] of the Internal Revenue Code).

Main Line apparently concurs with BOTA's findings that the term "operated" is not specifically defined in either the Kansas Constitution or in K.S.A. 79-1439(b)(1)(D); that words in common usage should be given their natural and ordinary meanings; and that Black's Law Dictionary 1091 (6th ed. 1990) defines "operate" as "[t]o perform a function, or operation, or produce an effect." The disagreement focuses on whether Main Line performed a function or operation, or produced an effect by entering into a lease agreement.

Main Line cites to *Lario* for support that leasing is equivalent to operating. That case is readily distinguishable. The case involved a tax exemption under K.S.A. 79-201a *Second,* and the question presented was whether the real estate was "used exclusively" by the State or any municipality or political subdivision of the state. *Lario,* 22 Kan. App. 2d at 860. Main Line did not seek a tax exemption but rather contends that its real estate was misclassified. Further, the arrangement analyzed by the *Lario* court was an agreement for Lario Enterprises to manage and operate Heartland Park Topeka for and on behalf of the City of Topeka. The Clinic did not contract to manage and operate the business or trade conducted on the property for the benefit of Main Line. Indeed, one would suspect that, if Main Line had endeavored to manage and operate a for-profit trade or business on the property, independently or through a contract with the Clinic, it would have run afoul of its permitted activities as a not-for-profit, tax-exempt, IRC 501(c)(3) organization. *Lario* is neither controlling nor particularly persuasive.

Main Line also relies on *League of Kansas Municipalities v. Board of Shawnee County Comm'rs,* 24 Kan. App. 2d 294, 944 P.2d 172 (1997), another tax exemption controversy under K.S.A. 79-201a *Second.* In upholding the tax exemption for the League, our court found that the League was an instrumentality of the cities and held that it was the use of the land, rather than its ownership, which is of primary importance. 24 Kan. App. 2d at 302. Obviously, the Clinic is operating on its own behalf for profit, rather than as

a tool or agent for Main Line. Again, this case is neither controlling nor persuasive.

Main Line asserts that *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 973 P.2d 176 (1999), teaches us two things: (1) that absent a statutory provision to the contrary, statutory "ownership" and "operation" do not have to be by the same entity; and (2) that the leasing of property, standing alone, is a "use" of that property and, therefore, fulfills the operated requirement. Again, the court was interpreting and applying a tax exemption provision, K.S.A. 79-201 *Ninth*. The University of Kansas School of Medicine—Wichita Medical Practice Association (WMPA), an IRC 501(c)(3) charitable organization, owned and leased real estate to the Wichita Primary Care Center (Center), also a tax-exempt not-for-profit organization.

Main Line focuses on opinion language suggesting that a property owner who leases the property is using it and that a lessor and lessee are simultaneously using the same property. Main Line's own brief, however, provides us with a quote of the court's controlling holding: "[W]here the property for which exemption is claimed is owned and leased by a corporation fulfilling all requirements of K.S.A. 79-201 *Ninth* to another separate corporation that operates the property and also fulfills all statutory requirements of K.S.A. 79-201 *Ninth*, exemption is appropriate." 266 Kan. at 769. Even if we were to buy into the argument that the subject property was being simultaneously operated by Main Line and the Clinic, the fact that the Clinic did not fulfill the statutory requirements of K.S.A. 79-1439(b)(1)(D) negates the applicability of *School of Medicine*. After noting that the 1989 amendment to K.S.A. 70-201 *Ninth* replaced "operated" with "owned and operated," the Kansas Supreme Court found that the amendment was "designed as part of a comprehensive attempt to prevent a situation wherein an entity that was not tax exempt would lease property to a tax exempt entity for a profit and thereby gain a tax benefit." 266 Kan. at 759. We suspect our Supreme Court would likewise look askance at a situation wherein an entity that was not tax exempt could gain a tax benefit by leasing from a tax exempt entity.

Finally, Main Line contends a prior BOTA decision, *In the Matter of the Equalization Appeal of Menorah Medical Center, Inc.*, No. 1998-5976-EQ (1999), mandates a finding that it operated the real property and BOTA erred in disregarding its own precedent. Main Line complains of the cursory manner in which BOTA disregarded the *Menorah* findings. However, notwithstanding Main Line's arguments to the contrary, the doctrine of stare decisis is not applicable to decisions of administrative tribunals. See *In re Appeal of K-Mart Corp.*, 238 Kan. 393, 396, 710 P.2d 1304 (1985). The court in *K-Mart* went on to state that "[t]here is no rule in Kansas that an administrative agency must explain its actions in refusing to follow a ruling of a predecessor board in a different case or that it must articulate in detail why the earlier ruling is not being followed." 238 Kan. at 396. Main Line argues that the factual differences between *K-Mart* and the present case indicate that BOTA should have followed the *Menorah* ruling in the present case. However, the factual differences do not negate the general rule that BOTA is not bound by its previous decisions and is not required to explain its departure from its previous decisions.

Further, after recognizing the *K-Mart* rule, BOTA noted that the facts in *Menorah* were "significantly different" from the facts in the present case. There, the owner occupied a portion of the building, which was used as a hospital, and provided for maintenance of common areas. Utilities for the rental offices and the hospital were provided from a common source. Granted, the factual differences do not totally explain the findings in *Menorah*. Nevertheless, we do not find *Menorah* to be persuasive.

Main Line, pointing to its tax exemption application, also suggests that it "perform(s) a function, or operation or produces an effect" by insuring the availability of health care facilities and services in the community through the subject property. In its application, Main Line told the IRS that it would be using its assets as follows: "Fixed Assets and Land are utilized in such a manner to ensure the availability of health care facilities and services to be utilized by certain *exempt members* of the Health Care, Inc. group including Hutchinson Hospital and Community Health Center, which

caters towards the indigent and medically underserved." (Emphasis added.)

We confess to being unsettled by our perception that the application misdirects attention away from the fact that virtually all of Main Line's assets would be leased to a for-profit, non-exempt Clinic. Nevertheless, the propriety of Main Line's tax-exempt status is not before us. However, our confusion as to how the lease to the Clinic insures the availability of facilities and services for the exempt members of Health Care, Inc., leads us to disregard this argument.

As alluded to earlier, appellate courts are to defer to BOTA's expertise when interpreting taxation statutes. See *In re Appeal of Intercard, Inc.*, 270 Kan. 346, 349, 14 P.3d 1111 (2000) (BOTA is specialized agency whose decisions are given great weight and deference when acting in its area of expertise). Therefore, we will not attempt to propound a bright line definition of "operated," as that term is employed in K.S.A. 79-1439(b)(1)(D). We do find, however, that an organization granted tax-exempt status under IRC 501(c)(3) does not operate real property by entering into a passive, triple-net commercial lease with a for-profit, non-tax-exempt entity which exclusively occupies and uses the property to conduct activities for profit.

## JURISDICTION

Our decision that Main Line would lose on the merits renders insignificant its complaint that BOTA should not have dismissed a portion of its claims. However, we do state that we would reject Main Line's creative argument that K.S.A. 79-1439(b)(1)(D) is a partial exemption statute; its function is to classify property. Further, we would find that nothing in K.S.A. 2003 Supp. 79-213 would excuse Main Line's failure to file an initial request for exemption. All other jurisdictional issues have been abandoned on appeal.

Affirmed.